UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. BK08-83016 |
| | ) | A10-8052 |
| TRI-STATE FINANCIAL, LLC, | ) | |
| d/b/a North Country Ethanol, | ) | |
| | ) | CHAPTER 11 |
| Debtor. | ) | |
| _____ | ) | |
| Thomas D. Stalnaker, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| George Allison, Jr.; Frank Cernik; | ) | |
| Phyllis Cernik; Chris Daniel; Amy Daniel; | ) | |
| Distefano Family Ltd. Partnership; | ) | |
| Mark E. Ehrhart; Robert G. Griffin; | ) | |
| John L. Hoich; Denise Hoich; Timothy | ) | |
| Jackes; James G. Jandrain; American | ) | |
| Interstate Bank; George Kramer; Bernie | ) | |
| Marquardt; Radio Engineering Industries, | ) | **ORDER** |
| Inc.; Joseph Vacanti, Trustee of the | ) | |
| Joseph & Cynthia Vacanti Trust; and | ) | |
| Centris Federal Credit Union, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| Centris Federal Credit Union, | ) | |
| | ) | |
| Counterclaim and | ) | |
| Cross-Claim Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Thomas D. Stalnaker, Trustee, | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |

1

| | |
|---|---|
| George Allison, Jr.; Frank Cernik; | ) |
| Phyllis Cernik; Chris Daniel; Amy Daniel; | ) |
| Distefano Family Ltd. Partnership; | ) |
| Mark E. Ehrhart; Robert G. Griffin; | ) |
| John L. Hoich; Denise Hoich; Timothy | ) |
| Jackes; James G. Jandrain; Linda L. | ) |
| Klassmeyer; George Kramer; Bernie | ) |
| Marquardt; Radio Engineering Industries, | ) |
| Inc.; and Joseph Vacanti, Trustee of the | ) |
| Joseph & Cynthia Vacanti Trust, | ) |
| | ) |
| Cross-Claim Defendants. | ) |
| | ) |

## I.    Introduction

Bankruptcy Trustee Thomas D. Stalnaker filed this adversary proceeding, requesting the Court to determine ownership of $1,190,000 he received from the bankruptcy estate of Tri-State Ethanol Company, LLC.[1]  Trial of this matter was held in late October 2013. The Court found that the funds were property of the Defendants other than Centris Federal Credit Union and not property of the Tri-State Financial, LLC bankruptcy estate.  Doc. 313. The Court also concluded that the bankruptcy estate is entitled to reimbursement for legal fees and expenses incurred in this adversary proceeding as well as those incurred in litigating and settling the claim for $1,190,000 Stalnaker pursued in In re Tri-State Ethanol Company, LLC.  Doc. 313.  After notice and a hearing on Stalnaker's Application for Compensation and Statement of Fees, the Court concluded that the $61,886.90 in legal fees and expenses the estate incurred in litigating this adversary case and the $35,944.45 in legal fees and expenses it incurred in litigating Tri-State Financial's claim in In re Tri-

---

[1]  See In re Tri-State Ethanol Company, LLC, Case No. BK 03-10194, District of South Dakota.

State Ethanol Company, LLC should be surcharged against the $1,190,000 Stalnaker received from the Tri-State Ethanol bankruptcy estate.  Doc. 323.  It entered judgment accordingly. Doc. 324.[2]

Stalnaker and Centris appealed the judgment to the extent the Court determined that the $1,190,000 was not property of the bankruptcy estate.  George Allison, Jr., Frank and Phyllis Cernik, Chris and Amy Daniel, Distefano Family Ltd. Partnership, Timothy Jackes, James G. Jandrain, George Kramer and Bernie Marquardt appealed the judgment to the extent the Court surcharged the $61,866.90 in legal fees and expenses the estate incurred in litigating this adversary case against the $1,190,000 Stalnaker received from the Tri-State Ethanol bankruptcy estate.

The United States Bankruptcy Appellate Panel for the Eighth Circuit reversed and remanded this case for further proceedings.  Specifically, the Bankruptcy Appellate Panel found that the Court did not address the argument –  asserted by both Stalnaker and Centris – that Defendants/Appellees (also referred to as the Omaha Group) should be judicially and equitably estopped from asserting ownership to the $1,190,000 Stalnaker received from the Tri-State Ethanol bankruptcy estate or from claiming that Debtor Tri-State Financial does not own the funds.  The Bankruptcy Appellate Panel also found that the Court did not address Centris' and Stalnaker's argument that a release executed in August 2006 by all but two members of the Omaha Group "includes any claimed obligation of [Tri-

_____

[2] The United States Bankruptcy Court for the District of Nebraska ("the Court"), Bankruptcy Judge Timothy J. Mahoney presiding, entered an Order and Judgment in this adversary proceeding.  The decision was appealed to the United States Bankruptcy Appellate Panel for the Eighth Circuit, which reversed the judgment and remanded the case for further proceedings.  After remand, Bankruptcy Judge Shon Hastings, sitting by designation, was assigned to this case.

State Financial] to turn over the [$1,190,000] to [those parties]." Doc. 356-1. Rather than

interpreting the Court's silence as an implicit rejection of these arguments, it reversed and

remanded the case to allow the Court an opportunity to articulate its findings and explain

its reasoning. It declined to consider any of the issues raised on appeal, noting that review

of the issues was premature.

Since the Bankruptcy Appellate Panel did not consider or resolve any issues on

appeal, this Court found that it was free to reconsider its original ruling.[3] Although hesitant

to enter a decision inconsistent with the February 13, 2013 Order out of great respect for

the original trial court judge, upon reconsideration the Court reached a different conclusion.

On May 22, 2014, the Court entered an Order finding that the $1,190,000 at issue is

property of the bankruptcy estate. It entered judgment on the same day.

Most of the named defendants appealed. On appeal, American Interstate Bank

argued, inter alia, that this Court did not comply with Rule 63 of the Federal Rules of Civil

---

[3] The law of the case doctrine "prevents the relitigation of a settled issue in a
case and requires courts to adhere to decisions made in earlier proceedings in order to
ensure uniformity of decisions, protect the expectations of the parties, and promote
judicial economy." Myers v. Raynor (In re Raynor), 617 F.3d 1065, 1068 (8th Cir. 2010)
(quoting United States v. Bartsh, 69 F.3d 864, 866 (8th Cir. 1995)). When a case has
been decided by an appellate court and remanded, every question decided by the
appellate court, whether expressly or by necessary implication, is finally settled and
determined, thus creating a mandate for the lower court. Gourley v. Usery (In re Usery),
242 B.R. 450, 457 (B.A.P. 8th Cir. 1999) (citations omitted). The mandate of the
appellate court is completely controlling as to all matters within its compass, but on
remand the trial court is free to reconsider any issue that was not expressly or impliedly
resolved on appeal. Id. (citations omitted). In other words, the lower court is not bound
by its own earlier rulings unless explicitly or implicitly adopted by the appellate court. Id.
(citations omitted). The fact that the case was transferred to a different judge after
remand does not affect a successor judge's ability to reconsider issues not finally
determined by the prior appeal. Id. (citing Exxon Corp. v. United States, 931 F.2d 874,
878 (Fed. Cir. 1991) ("To the extent that a trial judge can alter a previous ruling, so too
can a successor judge.")).

Procedure  which applies to bankruptcy proceedings pursuant to Rule 9028 of the Federal

Rules of Bankruptcy Procedure.  The Bankruptcy Appellate Panel agreed.  It reversed and

remanded the case for further proceedings consistent with its opinion.

The Bankruptcy Appellate Panel issued its mandate on November 25, 2014.  On the

same day, this Court entered a Certification of Familiarity pursuant to Rule 9028 of the

Federal Rules of Bankruptcy Procedure.  In its certification, it granted the parties who

appeared at trial 21 days to request recall of any witness whose testimony it claims is

material and disputed and who is available to testify again without undue burden.

On December 15, 2014, Defendants Radio Engineering Industries, Inc., American

Interstate Bank, John Hoich and Denise Hoich filed a Joint List of Witnesses Certain

Defendants Wish to Recall for Further Testimony.  Centris Federal Credit Union and

Trustee Thomas Stalnaker objected to Defendants' request to recall witnesses.  Doc. 398.

In their pleading, Defendants neither asserted that testimony from the witnesses listed was

material and disputed nor did they explain why it is necessary for the Court to hear this

testimony in person rather than relying on the transcript and trial recordings previously

considered.  Also, Defendants did not advise whether the witnesses were available without

undue burden.  The Court ordered the parties to provide this information in a brief filed not

later than Friday, January 9, 2015.  None of the Defendants filed the brief requested.

Rather, they withdrew their joint list of witnesses. Docs. 404, 405, 406.

No other parties requested that the Court rehear testimony or argument.

For the reasons provided below, the Court finds that the $1,190,000 at issue is

property of the bankruptcy estate.  Consequently, the equitable and judicial estoppel

arguments asserted by Stalnaker and Centris are moot.

5

## II.    Findings of Fact

Tri-State Ethanol Company, LLC, a South Dakota limited liability company, was formed to create and operate an ethanol plant in or near Rosholt, South Dakota.  It petitioned for bankruptcy relief under Chapter 11 of the Bankruptcy Code on May 23, 2003, in the United States Bankruptcy Court for the District of South Dakota.

Tri-State Financial, LLC was formed on June 20, 2003, less than a month after Tri-State Ethanol filed its petition.[4]  At or about the time Tri-State Financial was formed, Defendant James Jandrain applied for a tax identification number on behalf of Tri-State Financial.  Although the form includes a blank where the applicant may acknowledge a trust role or relationship, Jandrain did not check the "trust" box or otherwise disclose that Tri-State Financial was a trustee.

Between June 20, 2003, and July 18, 2003, approximately 20 of the members of Tri-State Ethanol (referred to as "the Omaha Group"[5]) transferred a total of $1,840,000 to Tri-

---

[4] The organizer of Tri-State Financial was Frederic D. Stehlik and the initial manager of the company was David L. Rubeck.  James Jandrain participated in the management of Tri-State Financial when it was formed and his employee, Penny Thelen, performed bookkeeping functions.  In or about June 2006, Jandrain was elected Chairman on the Board of Managers at Tri-State Financial.  Jandrain was the Managing Member of Tri-State Financial when it petitioned for bankruptcy relief in November 2008.

[5] The parties do not identify the specific members of the Omaha Group.  The Omaha Group includes investors who are not defendants in this proceeding. All of the Defendants (except Centris) were original members of the Omaha Group, held an interest in the funds transferred by an Omaha Group member or were transferees or assignees of interests from a member of the Omaha Group (Omaha Group Defendants).

State Financial's checking account at First National Bank of Omaha.[6]  Defendant James

Jandrain transferred an additional $160,000 to the same checking account on June 9,

2004.   These fund transfers were recorded as a "$2M call" and treated as capital

contributions in Tri-State Financial's General Ledger.  Penny Thelen, who has worked as

a controller/accountant for Jandrain for 18 or 19 years, prepared the General Ledger.[7]

Jandrain and/or Thelen referred to the transfer of $2,000,000 from the Omaha Group to Tri-

State Financial as capital calls or capital contributions in other documents and

correspondence as well.[8]

Contrary to this documentation, Jandrain, who is an attorney[9] and a certified public

accountant, testified at trial that "capital contribution" did not accurately reflect the nature

of these funds.  He explained that the Omaha Group did not receive equity in exchange for

the $2,000,000 it transferred to Tri-State Financial; Tri-State Financial did not issue shares

---

[6] Tri-State Financial's checking account with First National Bank of Omaha did not reflect that Tri-State Financial was a trustee or that the funds in the account were trust res.

[7] According to Thelen, Tri-State Financial's General Ledger was an internal document, never used outside of the company and never provided to creditors.

[8] Likewise, Defendant Radio Engineering Industries, Inc. originally recorded its transfer of funds to Tri-State Financial as an equity investment.  It recharacterized this capital contribution as a receivable owed by Tri-State Financial in late 2005.

[9] At trial, Jandrain testified that his license to practice law was currently inactive.

or units in the company to the Omaha Group.[10]  According to Jandrain, the Omaha Group received no consideration for its money.

Between July 1, 2003, and July 7, 2004, Tri-State Financial transferred $793,645.42 of the funds in its account with First National Bank of Omaha to Tri-State Ethanol and $1,190,000 of the funds in this account to ICM, a vendor of Tri-State Ethanol.  Tri-State Financial's General Ledger reflects this fund transfer as a "Loan to TSE."  Thelen testified that the funds in the First National Bank of Omaha account were dissipated in 2004.  A June 2004 bank statement reflects that only $85.00 was left in the account on June 30, 2004.

Tri-State Financial earned approximately $9,758 in interest on its First National Bank of Omaha checking account in 2003 and 2004.  It did not distribute this interest earned to the Omaha Group.  Tri-State Financial received IRS Form 1099s for this earned interest. It did not file income tax returns for fiscal years 2003 and 2004.

On July 28, 2004, Tri-State Ethanol's Chapter 11 bankruptcy case was converted to a case under Chapter 7.  John Lovald was appointed bankruptcy trustee.  Lovald sold the Tri-State Ethanol plant at an auction.

In early 2005, Tri-State Financial acquired the ethanol plant sold during Tri-State Ethanol's bankruptcy proceedings.  To buy the plant, Tri-State Financial accepted capital contributions from a number of people and entities, including the Omaha Group.  Tri-State Financial issued equity units to those who made capital contributions.

---

[10] In support of this claim, Jandrain and Amy McFarland (who performed some bookkeeping responsibilities for Tri-State Financial between 2004 and 2008) maintained that Tri-State Financial did not distribute Schedule K-1 tax forms to the Omaha Group relating to or reflecting their $2,000,000 contribution or any credits to it.

8

In or before March 2005, Tri-State Financial began maintaining its accounting records on QuickBooks. The QuickBooks data files do not include the check register for Tri-State Financial's account with First National Bank of Omaha. Accounting records pertaining to the $2,000,000 transfer from the Omaha Group to Tri-State Ethanol were kept separate from other Tri-State Financial records.

On January 24, 2005, Tri-State Financial filed a proof of claim in the Tri-State Ethanol bankruptcy. On the form, Tri-State Financial asserted an unsecured claim for $1,983,654.42 for "Money loaned post-petition to debtor-in-possession from 7/14/03 to 6/15/04." Doc. 187.[11] On the same day, Tri-State Financial filed a "Request of Tri-State Financial LLC for Allowance of Administrative Expenses." Attorney Jerrold L. Strasheim signed and filed these documents on behalf of Tri-State Financial. Tri-State Financial authorized him to do so. The Omaha Group was notified of the claim and the request for allowance of administrative expenses.[12]

---

[11] Unlike the current version of the Proof of Claim form, the form Tri-State Financial filed did not include a series of boxes requesting the claimant to disclose whether he/she/it was a trustee, creditor, creditor's authorized agent, guarantor, surety, indorser or other codebtor. Stalnaker conceded that, at the time the claim was filed, he knew of no rule requiring a person filing a proof of claim to sign as agent or trustee when he signs a proof of claim. He also agreed that Attorney Strasheim violated no rule when he signed the claim "just on behalf of Tri-State Financial." Stalnaker Test., Doc. 353, 115:2-117:22.

[12] Strasheim, who was retained by Tri-State Financial before it petitioned for bankruptcy relief, typically discussed the actions he took on behalf of Tri-State Financial with Jandrain and some members of the Omaha Group. Jandrain acted as the representative of the Omaha Group with regard to Tri-State Ethanol bankruptcy issues. Jandrain reported litigation information from Strasheim to the other members of Tri-State Financial and the Omaha Group.

In the Request of Tri-State Financial LLC for Allowance of Administrative Expenses, Strasheim represented that Tri-State Financial orally agreed to make unsecured postpetition "loans" to Tri-State Ethanol totaling $1,983,654.42.  He also represented that the "loans" were "actual and necessary expenses of TSF, incurred by TSF in making a substantial contribution which directly and materially increased the value" of Tri-State Ethanol's plant by millions of dollars.  The documents include no reference to a trust between the Omaha Group and Tri-State Financial.  The documents do not suggest that a person or entity other than Tri-State Financial loaned the money to Tri-State Ethanol. Electronic mail messages between Strasheim, Ruback and Jandrain reflect that Tri-State Financial's managers, with the advice of counsel, made a purposeful decision to file the claim on behalf of Tri-State Financial and not in the name of the members of the Omaha Group, who provided funding to Tri-State Ethanol through Tri-State Financial.[13]

---

[13] In an email sent November 5, 2004, Attorney Strasheim advised Tri-State Financial managers Jandrain and Ruback:

> I have a general notion that the items on the list may have been provided by individuals or companies such as yours directly to TSE or its creditors. It will be very important that any request for payment or proof of claim be filed by the right party or, in other words, the party to whom the money is owed.  The documentation will have to be used in evidence and it cannot contradict what the Request for Payment or Proof of Claim said.

> If the documents show that Radio Engineering provided the money to TSE, it would be important that I know.  If the money was provided by Radio Engineering to TSF and deposited in TSF's bank account and then paid to TSE – in other words, loaned by Radio Engineering to TSF and then loaned by TSF to TSE – then TSF probably should be the claimant in the bankruptcy.  The paper trail of the money and the arrangements between the parties before the money got to TSE is important.

Doc. 255.  The response from Jandrain's email account provides: "Also, Jerry, the claim should be made by TSF.  We would have capital calls and the money would go into the

None of the members of the Omaha Group filed a proof of claim in the Tri-State Ethanol case claiming an interest in the $1,983,654.42 listed on the Tri-State Financial proof of claim. None of the defendants objected to Tri-State Financial's claim or responded to its request for allowance of administrative expenses.

Lovald, trustee for the Tri-State Ethanol bankruptcy estate, objected to Tri-State Financial's claim. Specifically, Lovald asserted that Tri-State Financial's claim for the advances Tri-State Financial made to Tri-State Ethanol between May 23, 2003, and July 28, 2004, should not be allowed and paid as an administrative expense in the amount of $1,983,654.42. Lovald also initiated an adversary action related to the same issues.

Lovald and Tri-State Financial reached a compromise agreement in which the parties agreed that $793,654.42 of Tri-State Financial's claim would be allowed as an administrative claim and the remaining $1,190,000 of its claim would be allowed as a timely-filed general unsecured claim, subordinated to the other allowed general unsecured claims. The parties also agreed that, upon bankruptcy court approval, the settlement was binding on "Lovald, Trustee, Tri-State Ethanol's Bankruptcy Estate, Tri-State Financial, Tri-State Ethanol, and all creditors and all parties in interest in Bankruptcy." Doc. 198. The bankruptcy court in In re Tri-State Ethanol Company, LLC approved the compromise agreement on June 14, 2006.

---

TSF account, and then wired to the TSE account in South Dakota." Id. Jandrain testified that Thelen wrote and sent this email from his account and claimed Thelen did not understand the terminology. Jandrain admitted that Thelen regularly printed emails for him to read and that she had authority to respond to this message. He also did not correct the "misnomer" or clarify that the claim was actually made on behalf of beneficiaries to a trust rather than on behalf of Tri-State Financial before or after the claim was filed.

11

After Tri-State Financial filed its proof of claim, but before the trustee's objection was resolved through compromise, the Omaha Group Defendants participated in a meeting where the claim was raised.  Members of the Omaha Group asked why their $2,000,000 in contributions to Tri-State Financial were not treated as equity.  Jandrain and others explained that if the Tri-State Ethanol plan had been confirmed, the Omaha Group contributions would have been converted to equity.  Since the plan was not confirmed, the contributions would not be treated as equity because to do so would dilute the shares of other investors.[14]

In a memorandum dated April 23, 2006, to Tri-State Financial investors, Jandrain reemphasized that the $2,000,000 in contributions from the Omaha Group to Tri-State

---

[14] According to April 23, 2005, Meeting Minutes, the discussion was summarized as follows:

> Vacanti and Ruback asked why the $2.0M that Omaha loaned to TEC in 2003-2004 was not listed on the investor roster prepared by Penny that was distributed to all the members prior to the meeting.  Jandrain and VanderGriend took turns explaining this money was contributed post-bankruptcy, but prior to the chapter 7 conversion.  Originally, this $2.0M [plus $1.0M of TCP's corn claim] was included on the investor roster because it was going to be converted to equity upon confirmation of the reorganization plan.  When the plan was not approved, the money remained as a loan to TEC and Omaha filed an administrative claim against the TEC estate for $2.0M. [Likewise, TCP filed a $1.0M corn claim against the estate.]

> VanderGriend reiterated it should not be on the roster because it dilutes ICM, who is presently carrying Omaha's $2.0M administrative claim and TCP's $1.0M corn claim.  Upon receipt of the bridge loan proceeds by ICM, the $3.0M can then be included as equity.  Jandrain also explained that when the Trustee pays out the $2.0M administrative claim and TCP's corn claim of $1.0M, the bridge loan would be repaid.  Jandrain stated a trial is set for May 11-12 to determine the position of Omaha's administrative claim.

Doc. 190.

Financial was not a capital contribution. He wrote: "Also, the Omaha group loaned $2.0M (not a capital contribution) to the plant during the bankruptcy and this should be repaid by the trustee so it is not included in the ownership structure either. Unfortunately, the trustee will not pay us interest on this loan so we may seek reimbursement from the plant." Doc. 267.

On June 7, 2006, Tri-State Financial borrowed $18,000,000 from Centris. Centris and Tri-State Financial executed a written credit agreement and security agreement related to this loan. According to the security agreement, Centris' collateral includes rights to payment of money and general intangibles, "including, without limitation, all payment intangibles." Doc. 174. Centris filed a UCC financial statement with the Nebraska Secretary of State on or about June 6, 2006. Jandrain executed this document in his capacity as manager of Tri-State Financial. On the date of trial, the sum Tri-State Financial owed Centris on the credit agreement was in excess of $1,190,000.

On the same day in June 2006, and in contemplation of the Centris loan agreement, Tri-State Financial entered into a Membership Interest Redemption Agreement with Radio Engineering Industries, Inc. (REI), in which it agreed to purchase REI's interest in Tri-State Financial. REI sold all of its equity in Tri-State Financial, but retained its right to receive its share of the administrative claim Tri-State Financial filed in the Tri-State Ethanol bankruptcy case.[15] According to Jandrain, Tri-State Financial also purchased ICM's interest in Tri-State Financial on or about June 7, 2006.

---

[15] Similarly, in January 2008, John Hoich sold equity units to Jandrain and other unit holders, but retained the right to receive "his share of a potential receivable from the Tri-State Ethanol Co., LLC bankruptcy estate." Doc. 233.

Shortly after the buyouts, Jandrain became Chairman of the Tri-State Financial Board of Managers.  In June and July 2006, Tri-State Financial paid Jandrain $361,503.75 from its operational checking account for services he performed beginning in January 2003.

On June 30, 2006, Lovald disbursed $793,654.42 to Tri-State Financial as payment on Tri-State Financial's administrative claim.  Jandrain deposited the check into Tri-State Financial's account with First National Bank of Omaha and then disbursed the funds to the Omaha Group, including REI.  In a letter accompanying the check to each member of the Omaha Group who received a payment, Thelen stated: "Any unpaid portion of our $2,000,000 loan that is not paid from the trustee will eventually be paid to us by the plant." Doc. 269.  Thelen testified that Tri-State Financial was "the plant" referenced in her letter.

On or about July 13, 2006, Tri-State Financial disbursed $465,851.17 from its general operations checking account to the Omaha Group as a payment for the loan interest expense they incurred in making their $2,000,000 contributions in June/July 2003.

On August 28, 2006, some of the Omaha Group Defendants executed a release. REI, Denise Hoich and American Interstate Bank did not sign the release.  Jandrain signed the release in his capacity as manager of Tri-State Financial and also as a managing representative of JGJCPA, LLC, KAAPS, LLC and North Country Investors, LLC.  He did not sign the release in his personal capacity.  The release includes the following language:

> THIS RELEASE ("Release") is given on this 28th day of August, 2006 by the undersigned members of Tri-State Financial, LLC (collectively "Releasors") in favor of Tri-State Financial LLC, ("Tri-State"), a Nebraska limited liability company and its current and former members, managers, employees and agents (collectively referred to as "Releasees").
>
> FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, Releasors hereby unconditionally release and forever discharge Releasees from and against any and all claims,

14

demands, actions, suits, penalties, liabilities, damages (liquidated or not), remedies, costs or expenses which Releasors now have, or may claim to have, whether known or unknown, existing prior to or as of the date hereof against Releasees arising out of or related to (a) Releasees' ownership or equitable membership units in or the management or operation of Tri-State, (b) the sale, purchase or redemption of any member units of Tri-State including any such transactions with ICM, Inc., Radio Engineering Industries, Inc., Lake Agassiz, LLC and Lake Agassiz Ethanol, LLC (c) claims that Releasees, jointly or severally, (i) breached any express or implied agreement, (ii) breached any duty, obligation or trust owed by Releasees to Releasors as recognized by law or equity, and (d) any other acts or omissions of Releasees occurring prior to the date of this Agreement of whatever nature, whether or not the same violates any principle of tort or contract law or at equity.

It is the intent of the parties that this Release effectuates a full, complete, comprehensive and final release and settlement of any and all claims, demands, actions, suits, liabilities, damages, costs and expenses, whether known or unknown, which Releasors may have or could assert against Releasees arising from or related to each and every business dealing, relationship and enterprise between Releasors and Releasees existing prior to the date of this Release.

Doc. 191.   At trial, Stalnaker testified about the effect of this release.   On cross examination, Stalnaker agreed that "the people that put this money into Tri-State Financial aren't releasing the claims to return of their beneficial interest, their equity interest or anything like that."[16]

---

[16]  Stalnaker testified:

Headley: Only the members of Tri-State -- it releases Tri-State Financial for actions in running the business; isn't that true?
Stalnaker: Well, it -- Tri-State Financial is the one -- is the releasor, not -- it's not releasing Tri-State Financial, it says it's -- the releasees are our current former members, managers, employees and agents.
Headley:  It releases them?
Stalnaker:  That's what it says.
Headley:  Right. Right. So the people that put this money into Tri-State Financial aren't releasing the claims to return of their beneficial interest, their equity interest or anything like that; isn't that true?
Stalnaker:  No, individuals are not giving this release. So no, they would not be.

15

Tri-State Financial petitioned for bankruptcy relief on November 21, 2008.  Jandrain signed the petition as "Managing Member."    Tri-State Financial did not include its $1,190,000 claim in the Tri-State Ethanol bankruptcy case on the schedules it filed in this case.

Stalnaker was appointed bankruptcy trustee on January 8, 2009.[17]    Stalnaker regularly communicated with Jandrain or his attorney regarding matters related to Tri-State Financial.

One of the ongoing disputes in the Tri-State Ethanol bankruptcy case involved a claim filed by American Prairie Construction Company f/k/a North Central Construction, Inc. (American Prairie).    American Prairie is a construction contractor that built the ethanol facility previously owned by Tri-State Ethanol and purchased by Tri-State Financial in 2005. Prior to the Tri-State Ethanol bankruptcy, American Prairie and Tri-State Ethanol were involved in litigation related to a lien(s) filed by American Prairie.    After Tri-State Ethanol petitioned for bankruptcy relief, American Prairie filed a proof of claim, and Tri-State Ethanol disputed the claim in adversary proceedings and contested matters.    Eventually the parties reached a resolution of the disputes and filed a motion with the Tri-State Ethanol bankruptcy court to approve the compromise agreement.    Tri-State Financial objected to the motion.    The Tri-State Ethanol bankruptcy court approved the compromise agreement

---

Headley:    Correct. So they're not releasing a thing. Individuals aren't releasing anything?
Stalnaker: No.

Doc. 353, 135:19-136:10.

[17] Tri-State Financial's Chapter 11 case was not converted to a case under chapter 7 until February 11, 2013.

over the objection.  Tri-State Financial appealed to the district court, which reversed the bankruptcy court and remanded the issue.

Outside the Tri-State Ethanol bankruptcy, American Prairie and Tri-State Financial participated in litigation filed in the United States District Court for the District of South Dakota regarding an alleged settlement between Tri-State Financial, one of its members (John Hoich) and American Prairie related to American Prairie's claims and liens against Tri-State Ethanol and American Prairie's equity interest in Tri-State Ethanol.  The district court entered judgment in favor of American Prairie and against Tri-State Financial and Hoich.  The judgment was appealed.

Sometime after Stalnaker was appointed in January 2009, he participated in negotiations with American Prairie and Lovald (Tri-State Ethanol's bankruptcy trustee) to resolve the pending issues between the parties.  These negotiations included discussions regarding whether the bankruptcy estate of Tri-State Ethanol would have funds sufficient to pay Tri-State Financial's unsecured claim in the sum of $1,190,000 as a result of the compromise or refusal to consent to the compromise.  Stalnaker testified that if he prevailed on his objection to the settlement and American Prairie lost its dispute with Tri-State Ethanol, it was possible that more than $4,500,000 would be available to pay Tri-State Financial's unsecured claim and other unsecured claims, with funds left for equity distributions to members of Tri-State Ethanol, including Tri-State Financial. However, if American Prairie prevailed, there may be no funds available to Tri-State Financial.  Stalnaker regularly communicated with Jandrain or his attorney and several members of the Omaha Group regarding these negotiations and the implications of a compromise.

17

In October 2009, American Prairie and Lovald reached an agreement resolving their disputes.  Stalnaker agreed to forgo filing an objection to the compromise agreement. Lovald filed a motion to approve the compromise agreement on or about October 19, 2009. The Tri-State Ethanol bankruptcy court approved the agreement on November 13, 2009.

Lovald disbursed $1,190,000 to Tri-State Financial as payment on Tri-State Financial's subordinated general unsecured claim in December 2009.  It was not until December 31, 2009, that Stalnaker received written notice from the Omaha Group Defendants claiming that the $1,190,000 was not property of the bankruptcy estate and demanding that Stalnaker remit the funds to them.  Stalnaker did not learn of the Omaha Group Defendants' express and implied trust theory of recovery until he received this December 31, 2009, notice.  Stalnaker is holding the funds pending the outcome of this litigation.

Jandrain and Thelen maintained that the Omaha Group contributed funds to Tri-State Financial for the sole purpose of allowing Tri-State Financial to serve as a conduit for monies to be loaned by the Omaha Group to Tri-State Ethanol to pay expenses and repair construction deficiencies in the ethanol plant.  Jandrain claimed that Tri-State Financial held and transferred the funds to Tri-State Ethanol in a trust capacity.

At trial, Thelen and Jandrain confirmed that there are no trust agreements or trust documents that memorialize a trust relationship.  In fact, there are no documents prepared at the time the Omaha Group transferred money to Tri-State Financial that suggest that Tri-State Financial was accepting and holding the money in trust for those who contributed the money.  There are no loan agreements or promissory notes between Tri-State Ethanol and Tri-State Financial or between Tri-State Ethanol and the individual members of the Omaha

18

Group related to this fund transfer.  Other than the General Ledger created by Thelen and

bank records, no documents were prepared at the time the funds were transferred from the

Omaha Group to Tri-State Financial that characterize, define or explain the nature of the

transactions between Tri-State Financial and those who transferred money to it.

 None of the members of the Omaha Group asserted that Tri-State Financial was

holding their claim in trust before it petitioned for bankruptcy relief.  In fact, according to the

Summary of Uncontroverted Facts submitted by the parties and adopted by the Court,

>  n. At no time within the Tri-State Ethanol bankruptcy proceedings
> up through when Debtor TSF filed its Petition for Relief here, did any of the
> individual Defendants object to Debtor TSF's claim that the funds at issue
> were solely owed to Debtor.

Doc. 154; Doc. 323.

 None of the members of the Omaha Group filed a proof of claim in this case seeking

reimbursement for their interest in the $2,000,000 transferred to Tri-State Financial and

then to Tri-State Ethanol.  Several defendants, including Denise Hoich, James G. Jandrain

and Frank and Phyllis Cernik filed proofs of claim in this case seeking payment for other

debts they claimed Tri-State Financial owed to them.[18]

 Neither Jandrain nor the members of the Omaha Group advised Stalnaker of their

interest in Tri-State Financial's $1,190,000 unsecured claim filed in the Tri-State Ethanol

bankruptcy during the settlement negotiations with Lovald and American Prairie.  Instead,

---

[18] Hoich filed a claim for $41,251.00 arising from a loan to Tri-State Financial and
attached a copy of a promissory note to the Proof of Claim.  Likewise, the Cerniks filed
a claim for $200,000 and attached Loan Extension Agreements.  Similarly, Jandrain
filed a Proof of Claim and attached documentation, including a promissory note, a loan
extension agreement and a statement for professional services.

19

the members of Tri-State Financial, mainly through Jandrain or his attorney, supported the

Tri-State Financial bankruptcy estate's claim to the funds.

Thelen, Jandrain and Amy McFarland, who performed some bookkeeping

responsibilities for Tri-State Financial between 2004 and 2008, admitted that the trust

relationship between the Omaha Group and Tri-State Financial was never communicated

to Stalnaker or members of his firm prior to December 31, 2009, when the Omaha Group

demanded transfer of the funds based on this trust relationship.[19]  Likewise, the Executive

Vice President of REI did not inform Stalnaker about the trust relationship.  There is no

documentation received into evidence that would have put Stalnaker on notice that Tri-

State Financial held the $2,000,000 in trust for the Omaha Group or that suggests that Tri-

State Financial's claim for reimbursement of the funds would be made solely on their behalf

as beneficiaries of the trust.

Forensic accountant Robert Kirchner testified that, based on his review of Tri-State

Financial records and considering tax laws, regulations and various accounting standards,

the contributions from the Omaha Group in 2003 should have been characterized as equity

in Tri-State Financial records.  Any change in this status should have been recorded in

partnership resolutions or documentation from someone with authority and then

appropriately corrected in financial statements, but was not.  He testified that information

---

[19] Thelen testified that she never talked to Stalnaker or anyone from his office
about the $2,000,000 transferred through Tri-State Financial to Tri-State Ethanol.
Stalnaker met with Jandrain and his counsel several times after Stalnaker was
appointed trustee in this case.  Jandrain could not recall any meetings involving
Stalnaker where he or his attorney advised Stalnaker that Tri-State Financial filed its
claim in the Tri-Estate Ethanol case on behalf of the Omaha Group or that the funds at
issue were owned by any entity or person other than Tri-State Financial.

about these contributions should have been shared with auditors and properly reflected in financial statements and tax returns, but was not.  In his expert opinion, the information he reviewed does not support the trust relationship alleged by the Omaha Group Defendants.

## III.    Conclusions of Law

In general, all of a debtor's legal and equitable property interests existing at the time a bankruptcy petition is filed are property of the bankruptcy estate.  11 U.S.C. § 541(a)(1); In re Webb, 742 F.3d 824, 828 (8th Cir. 2014).  The question presented in this case is whether the $1,190,000 Stalnaker received from the Tri-State Ethanol bankruptcy estate is property of the Tri-State Financial bankruptcy estate; and if so, who is entitled to the funds.  Stalnaker asserts that the funds fall within the definition of section 541(a) and claims they are property of the bankruptcy estate.  Centris agrees that the funds are property of the bankruptcy estate, but asserts that the funds fall within the scope of its perfected security agreement.  It claims its security interest has priority over unsecured creditors' claims and asks the Court to award it the funds.

The Omaha Group Defendants argue that the funds are not property of the estate. Specifically, they assert that Tri-State Financial is a trustee, who transferred funds to Tri-State Ethanol and who made a claim for reimbursement of these funds on behalf of the beneficiaries of the trust – the Omaha Group.  The Omaha Group Defendants claim that Tri-State Financial holds only bare legal title to the funds and that the equitable ownership interest in the funds is held exclusively by the Omaha Group.  As beneficial owners of the Tri-State Ethanol claim, the Omaha Group Defendants request the Court to award the funds to them.

21

For the reasons discussed below, the Court rejects the Omaha Group Defendants' request for imposition of a trust and its assertion that Tri-State Financial holds only bare legal title to the funds.  The $1,190,000 at issue is property of the Tri-State Financial bankruptcy estate.

**A.    The Omaha Group Defendants did not meet their burden of showing the existence of an express, resulting or constructive trust.**

**1.    Express Trust**

The Omaha Group Defendants argue that certain memoranda, email messages and meeting minutes establish the existence of an express trust.  Contrary to their assertion, none of these documents specifically refer to a trust, define the duties of the trustee or expressly name Tri-State Financial as a trustee.  Thelen and Jandrain testified that there were no trust agreements or trust documents that memorialize the trust relationship.  In fact, there are no documents prepared at the time the Omaha Group transferred money to Tri-State Financial that suggest that Tri-State Financial was accepting and holding the money in trust for those who contributed the money.  Other than the General Ledger created by Thelen and bank records, no documents were prepared at the time the funds were transferred from the Omaha Group to Tri-State Financial that characterize, define or explain the nature of the transactions between Tri-State Financial and those who transferred money to it.  Accordingly, the Omaha Group Defendants failed to establish the existence of an express trust.

**2.    Resulting Trust**

Under Nebraska law, "a resulting trust is one raised by implication of law and presumed always to have been contemplated by the parties, the intention of the resulting

trust is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance." Wait v. Cornette, 612 N.W.2d 905, 910 (Neb. 2000) (citing Brtek v. Cihal, 515 N.W.2d 628 (Neb. 1994)). Where a transfer of property is made to one person and the purchase price or consideration was paid by another person, a resulting trust arises in favor of the person who made the payment or provided consideration. Id. "The court will impose a resulting trust when the circumstances surrounding a conveyance make it clear that the parties intended such a result." Brtek, 515 N.W.2d at 639 (citation omitted).

"A resulting trust will not be declared upon doubtful and uncertain grounds." Biggerstaff v. Ostrand, 261 N.W.2d 750, 754 (Neb. 1978). "The burden is upon the one claiming the existence of a resulting trust to establish the facts upon which it is based by clear and satisfactory evidence. Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." Brtek, 515 N.W.2d at 640 (citations omitted).

The Omaha Group Defendants argue that they established a trust relationship with Tri-State Financial when they transferred $2,000,000 to it as a conduit for support to Tri-State Ethanol.[20] While the evidence shows that the Omaha Group Defendants understood

---

[20] Stalnaker and Centris argue that the trust fund or res was dissipated when the funds were transferred to Tri-State Ethanol, and any new money received by the trustee is not subject to the claim of the beneficiaries. This argument ignores the Omaha Group Defendants' (alleged beneficiaries') assertions that they have a claim in the Tri-State Ethanol case, seeking to recover the trust res. Under the Restatement of Law, Trusts,

> If a trust is created and subsequently the whole of the trust property ceases to exist, the trust is terminated because the trustee no longer holds anything in trust. If, however, there remains so much as a claim against the trustee or another on behalf of the beneficiaries, the claim constitutes trust property

that their contributions to Tri-State Financial would be forwarded to Tri-State Ethanol to pay

expenses and repair construction deficiencies, they have not established, by clear and

convincing evidence, that the Omaha Group intended to create a trust when Tri-State

Financial was formed.  Rather, documents prepared at or about the time Tri-State Financial

was formed show that the managers and bookkeepers for Tri-State Financial treated the

$2,000,000 transferred to Tri-State Financial as capital contributions and the Omaha Group

assumed they would receive equity for their investment.

The Tri-State Financial General Ledger refers to the contributions as a "$2M call"

and treats this investment as capital.    Jandrain and Thelen regularly referred to the

$2,000,000 from the Omaha Group as a capital call or capital contributions in emails and

in other memoranda and correspondence as well.    Likewise, Defendant REI originally

recorded its transfer of funds to Tri-State Financial as an equity investment.  The Tri-State

Financial General Ledger also shows that the funds transferred to Tri-State Ethanol were

treated as a loan from Tri-State Financial to Tri-State Ethanol, honoring the distinction

between the Tri-State Financial partnership and its investors.

At or about the time Tri-State Financial was formed, Jandrain applied for a tax

identification number on behalf of Tri-State Financial.  Although the form includes a blank

where the applicant may acknowledge a trust role or relationship, Jandrain did not check

the "trust" box or otherwise disclose that Tri-State Financial was a trustee.  Likewise, the

Tri-State Financial checking account with First National Bank of Omaha does not reflect

_____

that continues to be held in trust for the beneficiaries.

Restatement (Third) of Trusts § 2 (2003).  Accordingly, <u>IF</u> a trust was created, the
beneficiaries have an actionable claim to the funds.

that Tri-State Financial was a trustee or that the funds in the account were trust res.

Jandrain, who is an attorney and a certified public accountant, presumably understood the

difference between loans, equity and trust status, yet made no effort to document a trust

relationship on the employer tax identification form, checking account or anywhere else.

Thelen and Jandrain confirmed that there are no trust agreements or trust documents that

memorialize the trust relationship.  In fact, there are no documents prepared at the time the

Omaha Group transferred money to Tri-State Financial that suggest Tri-State Financial was

accepting and holding the money in trust for those who contributed the money.  Other than

the General Ledger created by Thelen and bank records, no documents were prepared at

the time the funds were transferred from the Omaha Group to Tri-State Financial that

characterize, define or explain the nature of the transactions between Tri-State Financial

and those who transferred money to it.

Tri-State Financial filed a proof of claim in the Tri-State Ethanol bankruptcy in its own

name, not as a trustee on behalf of the Omaha Group.[21]   On the same day, Tri-State

Financial filed a "Request of Tri-State Financial LLC for Allowance of Administrative

Expenses."  The Omaha Group was notified of the claim and the request for allowance of

administrative expenses, but there is no evidence that it questioned the fact that the claim

and request were asserted on behalf of Tri-State Financial.

---

[21] The Omaha Group Defendants assert that, unlike the current version of the
Proof of Claim form, the form Tri-State Financial filed did not include a series of boxes
requesting the claimant to disclose whether he/she/it was a trustee, creditor, creditor's
authorized agent, guarantor, surety, indorser or other codebtor. The fact that the form
did not have a blank or box requiring Tri-State Financial to disclose that it was a trustee
did not preclude it from doing so.

25

In the Request of Tri-State Financial LLC for Allowance of Administrative Expenses, Strasheim represented that Tri-State Financial orally agreed to make unsecured postpetition "loans" to Tri-State Ethanol and represented that the "loans" were "actual and necessary expenses of TSF, incurred by TSF[.]"  The documents include no reference to a trust between the Omaha Group and Tri-State Financial.  The documents do not suggest that a person or entity other than Tri-State Financial loaned the money to Tri-State Ethanol.

Electronic mail messages between Strasheim, Ruback and Jandrain reflect that Tri-State Financial's managers, with the advice of counsel, made a purposeful decision to file the claim on behalf of Tri-State Financial – not in the name of Tri-State Financial as trustee and not in the name of the members of the Omaha Group, who provided funding to Tri-State Ethanol through Tri-State Financial.  See note 13, supra.  After the claim and Request for Allowance of Administrative Claim were filed, none of the Omaha Group Defendants sought to amend it.  None of the Omaha Group Defendants filed a proof of claim in the Tri-State Ethanol case claiming an interest in the $1,983,654.42 listed on the Tri-State Financial proof of claim.  None of the Defendants objected to Tri-State Financial's claim or responded to its request for allowance of administrative expenses.

At trial, Jandrain testified that his response to the email directing Attorney Strasheim to file the claim on behalf of Tri-State Financial was actually written by Thelen, and he claimed she did not understand the terminology.  See note 13, supra.  The Court is not persuaded.  Jandrain admitted that Thelen regularly printed emails for him to read and that she had authority to respond to this message.  He also did nothing to correct the "misnomer" or clarify that the claim was actually made on behalf of beneficiaries to a trust before or after the claim was filed.  Strasheim's questions go to the heart of the issue

26

presented to the Court.   If the Omaha Group actually intended to create a trust, the

response to Strasheim's questions was the opportunity to clarify this issue.   The decision

to treat the claim as one filed on behalf of Tri-State Financial and not the Omaha Group

was mindful.   Jandrain's testimony to the contrary is self-serving and unconvincing.

After Tri-State Financial filed its proof of claim in the Tri-State Ethanol case, but

before the trustee's objection was resolved through compromise, the Omaha Group

Defendants participated in a meeting where the claim was raised.[22]   Members of the

Omaha Group asked why the $2,000,000 they transferred to Tri-State Financial was not

treated as equity, again showing the intent and expectation of the Omaha Group.  Jandrain

and others explained that if the Tri-State Ethanol plan had been confirmed, the Omaha

---

[22] According to April 23, 2005, Meeting Minutes, the discussion was summarized
as follows:

> Vacanti and Ruback asked why the $2.0M that Omaha loaned to TEC in
> 2003-2004 was not listed on the investor roster prepared by Penny that was
> distributed to all the members prior to the meeting.    Jandrain and
> VanderGriend took turns explaining this money was contributed post-
> bankruptcy, but prior to the chapter 7 conversion.  Originally, this $2.0M [plus
> $1.0M of TCP's corn claim] was included on the investor roster because it
> was going to be converted to equity upon confirmation of the reorganization
> plan.   When the plan was not approved, the money remained as a loan to
> TEC and Omaha filed an administrative claim against the TEC estate for
> $2.0M. [Likewise, TCP filed a $1.0M corn claim against the estate.]

> VanderGriend reiterated it should not be on the roster because it dilutes ICM,
> who is presently carrying Omaha's $2.0M administrative claim and TCP's
> $1.0M corn claim.   Upon receipt of the bridge loan proceeds by ICM, the
> $3.0M can then be included as equity.  Jandrain also explained that when the
> Trustee pays out the $2.0M administrative claim and TCP's corn claim of
> $1.0M, the bridge loan would be repaid.  Jandrain stated a trial is set for May
> 11-12 to determine the position of Omaha's administrative claim.

Doc. 190.

Group's contributions would have been converted to equity.  Since the plan was not

confirmed, the contributions would not be treated as equity because to do so would dilute

the shares of other investors.  The minutes of this meeting show that Tri-State Financial

managers did not treat the Omaha Group's investment as equity because ICM objected to

this conversion – not because the Omaha Group intended to create a trust.  The minutes

also show that the Omaha Group was searching for ways to convert their investment to

equity (recognized membership units) through plan confirmation or a bridge loan.

In a memorandum dated April 23, 2006, to Tri-State Financial investors, Jandrain

reemphasized that the $2,000,000 in funds from the Omaha Group to Tri-State Financial

were not a capital contribution.  He wrote: "Also, the Omaha group loaned $2.0M (not a

capital contribution) to the plant during the bankruptcy and this should be repaid by the

trustee so it is not included in the ownership structure either.  Unfortunately, the trustee will

not pay us interest on this loan so we may seek reimbursement from the plant."  Doc. 267

(emphasis added).  In July 2006, Thelen (who wrote a letter to the Omaha Group on

Jandrain's letterhead) repeated: "Any unpaid portion of our $2,000,000 loan that is not paid

from the trustee will eventually be paid to us by the plant."  Doc. 269.  These documents

show that Tri-State Financial managers continued to maintain that the $2,000,000 in

contributions was not equity.  Instead, they referred to the contributions as a "loan" to Tri-

State Financial (also called the "plant").  The fact that Tri-State Financial agreed to repay

interest on the $2,000,000 supports a debtor/creditor relationship between Tri-State

Financial and the Omaha Group.   More importantly, this correspondence also

demonstrates that the Omaha Group and Tri-State Financial managers were not treating

the Tri-State Ethanol bankruptcy claims as trust property.  If they had, there would have been no expectation of an interest repayment from Tri-State Financial.

Similarly, Tri-State Financial's decision to disburse $465,851.17 from its general operations checking account to the Omaha Group as a payment for loan interest expenses they incurred in transferring the $2,000,000 to Tri-State Financial is more consistent with a debtor/creditor relationship than it is with a trust relationship.  A trustee would have no obligation to compensate beneficiaries for the cost of their money under these circumstances.  Conversely, Tri-State Financial did not disburse the $9,758 in interest it earned on its account with First National Bank of Omaha to the Omaha Group, which would have been consistent with a trust relationship.

The Omaha Group Defendants assert that the $2,000,000 invested in 2003 was segregated and treated differently than other capital calls and claim that this treatment is evidence that a trust was created.  In support of this proposition, the Omaha Group Defendants point to the fact that a separate bank account was used for the fund transfer; the accounting records for the $2,000,000 from the Omaha Group were not transferred to the QuickBooks program used for other Tri-State Financial records and were always maintained separately from Tri-State Financial statements and other financial records; Tri-State Financial did not rely on the claim with Tri-State Ethanol as collateral for credit; the Omaha Group received the $793,654.42 disbursement of the administrative claim from Tri-State Ethanol and no other Tri-State Financial unit holders received a share of this claim; and Tri-State Financial did not issue Schedule K-1 tax forms when this disbursement was made.

While it is apparent that the $2,000,000 investment from the Omaha Group was treated differently than the 2005 capital calls, the evidence shows that this distinction was not due to the alleged trust status. Instead, it is apparent that the $2,000,000 from the Omaha Group was treated differently because new investors expressed concern that their equity would be diluted and managers agreed to treat the funds differently. From the beginning the Omaha Group assumed it would receive equity for their investment, but did not take the necessary steps to preserve its interest by demanding shares or units. When Tri-State Financial began making plans to buy the Tri-State Ethanol plant, new investors objected to the treatment of the funds used to make an unsecured undocumented loan to Tri-State Ethanol as equity. Tri-State Financial managers then referred to the $2,000,000 investment as a loan from the Omaha Group to Tri-State Financial, not a trust. Segregating accounting records and disbursing the $793,654.42 administrative claim proceeds from Tri-State Ethanol to the Omaha Group is consistent with a debtor/creditor relationship. According to forensic accountant, Robert Kirchner, Tri-State Financial's failure to record the Omaha Group's contributions in its accounting records and tax forms is evidence of careless bookkeeping rather than proof of a trust. The Court agrees. Accordingly, the Court finds that the Omaha Group Defendants did not meet their burden of showing that they contemplated a trust arrangement when they transferred funds to Tri-State Financial in 2003 or at anytime before December 2009, when their attorney asserted this theory of recovery. Their request for the imposition of a resulting trust is rejected.

### 3.    Constructive Trust

"A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground

that his or her acquisition or retention of the property would constitute unjust enrichment."
<u>Wait</u>, 612 N.W.2d at 911.  Under Nebraska law, "a court, sitting in equity, will not impose
a constructive trust and constitute an individual as a trustee of the legal title for property
unless it be shown, by clear and convincing evidence, that the individual, as a potential
constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse
of an influential or confidential relationship and that, under the circumstances, such
individual should not, according to the rules of equity and good conscience, hold and enjoy
the property so obtained."  <u>Brtek</u>, 515 N.W.2d at 639 (citations omitted).  As with a resulting
trust, the party seeking to establish a constructive trust carries the burden of establishing
the factual foundation by clear and convincing evidence.  <u>Id.</u>; <u>ProData Computer Servs.
Inc., v. Ponec</u>, 590 N.W.2d 176, 181 (Neb. 1999).

The Omaha Group Defendants have not offered evidence that Tri-State Financial
obtained the $1,190,000 by fraud, misrepresentation or an abuse of an influential or
confidential relationship.  Further, the Court is not persuaded that the rules of equity require
that they receive the funds under the circumstances described above.  Their request for
this remedy is rejected as well.

### 4.   Release

Most of the Omaha Group Defendants' express and implied trust theories of
recovery fail for another reason – they executed a release that bars them from asserting
such a claim.

The Court received evidence that most of the Omaha Group Defendants executed a release in August 2006.  See Doc. 191.[23]  The release provides that the members of Tri-State Financial who executed the document released Tri-State Financial and its current and former members, managers, employees and agents from <u>any and all claims, demands, actions, suits, penalties, liabilities, damages (liquidated or not), remedies, costs or expenses</u> which Releasors now have, or may claim to have, whether known or unknown, existing prior to or as of August 28, 2006, arising out of or related to:

> (a) Releasees' ownership or equitable membership units in or the management or operation of Tri-State, (b) the sale, purchase or redemption of any member units of Tri-State including any such transactions with ICM, Inc., Radio Engineering Industries, Inc., Lake Agassiz, LLC and Lake Agassiz Ethanol, LLC (c) <u>claims</u> that Releasees, jointly or severally, (i) breached any express or <u>implied agreement</u>, (ii) <u>breached any duty, obligation or trust</u> owed by Releasees to Releasors as recognized by law or <u>equity</u>, and (d) <u>any other acts or omissions</u> of Releasees occurring prior to the date of this Agreement of whatever nature, whether or not the same violates any principle of tort or contract law or at equity.

Doc. 191 (emphasis added).

The release also states:

> It is the intent of the parties that this Release effectuates a full, complete, comprehensive and final release and settlement of any and all claims, demands, actions, suits, liabilities, damages, costs and expenses, whether known or unknown, which Releasors may have or could assert against Releasees arising from or related to <u>each and every business dealing, relationship and enterprise</u> between Releasors and Releasees existing prior to the date of this Release.

---

[23] Jandrain did not sign the release in his personal capacity, although he signed as Manager Member of JGJCPA, LLC, KAPPS, LLC and North Country Investors, LLC. American Interstate Bank, to whom Jandrain assigned his interest, did not execute the release.  REI and Denise Hoich did not sign the release.

Doc. 191 (emphasis added). Stalnaker and Centris argue that this "sweeping" release includes any alleged obligation of Tri-State Financial to turn over the $1,190,000 received from Tri-State Ethanol because Tri-State Financial was holding the funds as an alleged trustee.

In support of this argument, Centris and Stalnaker note that the Omaha Group Defendants who signed the release offered no testimony to explain the context of the release. The Court agrees. The Omaha Group Defendants do not dispute the lack of testimony. But, in their closing statement trial brief, they point to documents referring to events that took place about the same time and after the release was signed and suggest that these documents show that the parties who signed the release did not intend to release any ownership or beneficial ownership interest in the funds. These documents do not discuss the release or otherwise show the intent of the parties related to it.

Even if the documents cited by the Omaha Group Defendants had offered evidence of intent of the parties to the release, the Court would not be inclined to consider it because the terms of the release are not ambiguous.[24] "A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms." Davenport Ltd. P'ship v. 75th & Dodge I, L.P., 780 N.W.2d 416, 422 (Neb. 2010). See also Thrower v. Anson, 752 N.W.2d 555, 561 (Neb. 2008) ("Under the parol evidence rule, Thrower cannot rely upon evidence of a purported oral agreement to vary the written terms of the release, and therefore, Thrower's argument is without merit.");

---

[24] See Home Instead, Inc. v. Florance, 721 F.3d 494, 498 (8th Cir. 2013) (outlining Nebraska law on interpreting written contracts with and without ambiguities); Nebraska Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1040-41 (8th Cir. 2000) (same).

<u>Watmore v. Ford</u>, 425 N.W.2d 612, 615 (Neb. 1988) (overruled on other grounds) ("A release is a contract or a species of contract. 'The general rules governing the construction of contracts are applicable in the construction of written releases[.]'").

The release is broad. Contrary to the Omaha Group Defendants' arguments, the release is not limited to acts or omissions related to the sale, purchase or redemption of any member units of Tri-State Financial including any such transactions with ICM, Inc., REI, Lake Agassiz, LLC and Lake Agassiz Ethanol, LLC. This is only one of the issues addressed. The members who executed the release specifically released and forever discharged Tri-State Financial from:

- any and all claims, demands, actions, suits, penalties, liabilities, damages, remedies, costs or expenses,

- which they have, or may claim to have, whether known or unknown,

- existing on August 28, 2006, or before,

- arising out of or related to claims that Tri-State Financial breached any implied agreement or breached any duty, obligation or trust owed by Tri-State Financial to the Omaha Group Defendants who signed the release as recognized by law or equity.

The Omaha Group Defendants who signed the release also released claims for "any other acts or omissions of [Tri-State Financial] occurring prior to the date of this Agreement of whatever nature, whether or not the same violates any principle of tort or contract law or at equity." Doc. 191.

Tri-State Financial accepted funds from the Omaha Group in 2003 and transferred most of these funds to Tri-State Ethanol in 2003 and 2004. It filed its claim in the Tri-State

34

Ethanol case on January 24, 2005, 19 months before the release was executed. Therefore, to the extent that Tri-State Financial asserts that it is the owner of the $1,190,000 claim, denies that it is a trustee with a duty to act on behalf of the Omaha Group Defendants and refuses to turn over these funds absent a court order, any claim or request for an equitable remedy arising from such conduct was released and discharged.

The Omaha Group Defendants point to Stalnaker's testimony, where he agreed that "the people that put this money into Tri-State Financial aren't releasing the claims to return of their beneficial interest, their equity interest or anything like that." See note 16, supra. Stalnaker's testimony is an evidentiary admission that this Court considered and weighed with other evidence received in this case. Since Stalnaker was neither a party to the release nor involved in any of the events occurring at the time it was signed, the Court gives it no weight. His testimony certainly does not outweigh the unambiguous language of the release. Accordingly, the Court finds that the release bars those Defendants who signed the release (and their assignees and transferees) from asserting their equitable trust claims against Tri-State Financial for the $1,190,000 at issue in this case.

### 5.    Conclusion

The Omaha Group Defendants did not meet their burden of showing, by clear and satisfactory evidence, that the $1,190,000 was subject to a trust for their benefit. In addition, most of the Defendants are barred from asserting a claim to the $1,190,000 based on an express or implied trust theory of recovery because they released this claim. The $1,190,000 payment from the Tri-State Ethanol bankruptcy estate is property of the Tri-State Financial bankruptcy estate.

35

**B.    Centris met its burden of showing that its claim is superior to the claims asserted by Stalnaker.**

On June 7, 2006, Tri-State Financial borrowed $18,000,000 from Centris.  Centris and Tri-State Financial executed a written credit agreement and security agreement related to this loan, and Centris perfected its security interest by filing a UCC financial statement with the Nebraska Secretary of State on or about June 6, 2006.  According to the security agreement, Centris' collateral includes rights to payment of money and general intangibles, "including, without limitation, all payment intangibles."  Doc. 174.  On the date of trial, the sum Tri-State Financial owed Centris on the credit agreement was in excess of $1,190,000.

Stalnaker argues that the payment from the Tri-State Ethanol bankruptcy estate is not subject to Centris' security agreement under 11 U.S.C § 552(a) because he received the payment postpetition.  Tri-State Financial filed its claim in the Tri-State Ethanol case in January 2005 and Centris perfected its security interest in June 2006 – both before Tri-State Financial petitioned for bankruptcy relief.  Tri-State Financial's right to receive the payment accrued prepetition.  Its claim was based on a prepetition unsecured loan to Tri-State Ethanol; both the loan and the claim for reimbursement were filed prepetition.  The fact that the bankruptcy estate did not receive the funds until after Tri-State Financial filed for bankruptcy relief does not convert this prepetition asset and claim to after-acquired property.

Even if the payment is considered after-acquired property, the Court finds that the payment falls within the broad definition of "proceeds" under Nebraska law, and therefore, subject to the exception under section 552(b).  See Neb. Rev. Stat. § 9-315, cmt. 3; U.C.C. § 9-102; Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.), 316 B.R. 330, 336

(B.A.P. 9th Cir. 2004); In re Patio & Porch Sys., Inc., 194 B.R. 569, 573-75 (Bankr. D. Md. 1996). Stalnaker's argument is rejected.

At trial, Stalnaker also claimed that the $1,190,000 was not subject to Centris' security interest because the funds are simply the "type of assets that would go into the bankruptcy estate and would not be subject to their security interest. There are frequently assets like that that are unique to the bankruptcy situation." He later clarified that the funds are "held in trust for Tri-State Financial" and repeated his assertion that the funds exist outside of the typical assets that are subject to Centris' security interest. Stalnaker cites no authority for the proposition that the funds are a type of asset not subject to a perfected security interest. His assertion that the funds are held in trust is rejected for all the reasons discussed above.

The Court finds that the $1,190,000 payment from Tri-State Ethanol on Tri-State Financial's claim falls within the scope of Centris' security agreement. Accordingly, Centris met its burden of proving that its secured claim is entitled to priority over the claims asserted by the Tri-State Financial bankruptcy estate. It is awarded the balance of the $1,190,000 (after deducting $291,550 pursuant to the default judgment and assignments and after deducting attorney's fees and expenses surcharged against these funds).

## IV.    Conclusion

For the reasons stated above, the Court finds that the $1,190,000 in funds is property of the bankruptcy estate. Centris established that it holds a perfected security interest in the funds and that its claim is superior to Stalnaker's claim on behalf of unsecured creditors. Accordingly, the balance of the funds (after deducting payments made pursuant to a default judgment, assignments and stipulations and after deducting

37

attorney's fees and expenses surcharged against these funds[25]) are awarded to Centris.

The Court has considered all other arguments and deems them without merit.

Judgment shall be entered accordingly.

Dated: January 13, 2015.

Shon Hastings, Judge
United States Bankruptcy Court
Sitting by Designation

---

[25] The Order granting Application for Compensation and Statement of Fees filed by Stalnaker [Doc. 323] remains unaffected by this Order.